UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| GARY REINER, | ) |
| | ) |
| Movant, | ) |
| | ) |
| v. | ) |
| | ) Crim. No. 04-127-P-H |
| UNITED STATES OF AMERICA, | ) Civ. No. 09-118-P-H |
| | ) |
| Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION AND
ORDER DENYING MOTION FOR DISCOVERY**

Gary Reiner is finishing a sixty-month sentence for his federal conviction for crimes stemming from interstate trafficking of women, money laundering, and conspiracy charges. Reiner, along with other federal defendants, was involved with an establishment in Kittery, Maine called the "Danish Health Club" (DHC).[1]  In addition to contesting his conviction on Sixth Amendment ineffective assistance of counsel grounds, in this 28 U.S.C. § 2255 motion Reiner is complaining of his forfeiture obligation entered pursuant to the criminal judgment. Also pending is Reiner's motion for 28 U.S.C. § 2255 discovery that identifies twenty-six 'evidentiary' concerns he wishes to pursue.  Reiner is due to be released on July 8, 2010, and then will serve a period of supervised release.  He is also still subject to the Court's 3.9 million-dollar forfeiture determination. Reiner has filed a motion seeking discovery from the United States and third parties pursuant to Rule Governing Section 2255 Proceedings 6.   The United States has succinctly responded to that request (Doc. No. 23).  Based on the pleadings before me,

---

[1]      (Prosecution Version at 1, Crim. No. 04-125-P-H, Doc. 11.)

I deny Reiner's motion for discovery. In addition, I recommend that the Court deny Reiner 28 U.S.C. § 2255 relief.

### *Discussion*

Reiner's run-in with the law stemmed from his involvement with a health club in southern Maine that fronted itself as a relaxation massage parlor for men.  With respect to the circumstances of Reiner's prosecution, the First Circuit summarized:

> Reiner was the attorney for Kittery Health Club, Inc., doing business as The Danish Health Club, Inc. ("DHC"), in Kittery, Maine. The DHC advertised itself as a massage parlor for men, but in reality it offered sexual services in exchange for money. Reiner performed legal services for the DHC's original owner, Leo Manzoli, dating back to 1990. Leo Manzoli died in 1996, and Joel Lehrer, a business associate of his, took over the day to day operations of the DHC. Following Leo Manzoli's death, his wife, Mary Ann Manzoli ("Manzoli"), also took a more active role in the business. Joel Lehrer died in 2001, and some time thereafter Reiner became a co-trustee of K & D Realty Trust, which owned the property used by the DHC. Susan Lehrer, Joel Lehrer's widow, began to run the DHC in 2001, but was later relieved of her responsibilities by Reiner. Reiner then ran the DHC between 2001 and 2004. In 2001, Reiner hired Russell Pallas, a former police officer, to manage the front desk, and Reiner filled in for Pallas on occasion. Reiner was responsible for all personnel decisions concerning the female masseuses and handled the financial aspects of the business. In late 2003 and early 2004, the DHC ran advertisements in Xtreme Magazine, an adult periodical, and in the adult section of two alternative newspapers, the Portland Phoenix and the Boston Phoenix. Reiner was responsible for the content of the advertisements.
>
> On June 9, 2004, authorities executed a search warrant at the DHC. Rodney Giguere, a Special Agent with the Internal Revenue Service, prepared a thirty-five page affidavit in support of the search warrant. The affidavit relied upon (1) police reports and reports by the Federal Bureau of Investigation detailing investigations of the club; (2) statements by several confidential witnesses concerning occurrences of prostitution at the DHC; (3) the adult advertisements placed by Reiner; (4) an internet search by another IRS agent that revealed detailed descriptions of sexual encounters at the DHC; and (4) reports as well as a first-hand account of extensive visual surveillance conducted by the FBI. During the search authorities found numerous condoms located throughout the club. They also found a customer of the club on a massage table wearing a condom and a towel.

United States  v. Reiner, 500 F.3d 10, 13 (1st Cir. 2007). This summary identifies most of the key

players with respect to Reiner's case and his 28 U.S.C. § 2255 claims.

### A.  REINER'S 28 U.S.C. § 2255 CLAIMS

Not insignificant to the resolution of the pending motions is the First Circuit's counsel

that when a "petition for federal habeas relief is presented to the judge who presided at the

petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous

proceedings and make findings based thereon without convening an additional hearing." United

States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993).  In issuing the following recommended

decision I cannot take such liberty but I can approach the record in a fashion that takes into

account this Court's ability to do so on review of this recommendation.

### 1.  Ineffective Assistance of Counsel Claims

Reiner presents twenty-seven allegations of ineffective assistance of counsel.  The First

Circuit set forth the standard for 28 U.S.C. § 2255 ineffective assistance claims in United States

v. De La Cruz:

> The essence of an ineffective-assistance claim is that counsel's
> unprofessional errors so upset the adversarial balance between defense and
> prosecution that the trial was rendered unfair and the verdict rendered suspect."
> Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). In order to prevail, a
> defendant must show both that counsel's representation fell below an objective
> standard of reasonableness and that there exists a reasonable probability that, but
> for counsel's unprofessional errors, the result of the proceeding would have been
> different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). In other
> words, a defendant must demonstrate both seriously-deficient performance on the
> part of his counsel and prejudice resulting there from. In this case, Defendant has
> demonstrated neither.
> Although the Supreme Court in Strickland discussed the performance
> prong of an ineffectiveness claim before the prejudice prong, the Court made
> clear that "there is no reason for a court deciding an ineffective assistance claim to

approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.   As the Court noted: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

514 F.3d 121, 140 (1st Cir. 2008); accord Alfano v. United States, 592 F.Supp.2d 149, 154 -55

(D. Me. 2008); see Peralta v. United States, 597 F.3d 74, 82 (1st Cir. 2010) ("Trial counsel

inevitably must decide where to focus his or her efforts; not every fact can be double-checked.")

It is Reiner's claim that "trial counsel barely scratched the surface of the vast amount of

relevant, exculpatory evidence that they were well aware of."  (Pet'r Mem. Opp'n Gov't Mot.

Summ. Dismissal at 44.)   He elaborates:

> They failed to cross-examine the Government's critical witnesses on even the most basic issues relevant to Reiner's defense and to the credibility of their testimony, and they failed to call 19 witnesses to testify in Reiner's defense. Reiner's counsel also failed to utilize relevant documentary exhibits, such as those containing two Government witnesses' prior inconsistent statements, to impeach their credibility.  They similarly failed to use exhibits to support Reiner's defense that he was acting in good faith.  These many failures by Reiner's trial counsel deprived him of his Sixth Amendment right to effective counsel.  Had Reiner's counsel done an even minimally effective job in presenting this voluminous evidence, the Court and the jury would have received a dramatically different picture of what really went on at the DHC and what the true role of Mrs. Manzoli, Susan Lehrer, Russell Pallas, Richard Emery, the various massage attendants, and even Reiner himself were.

(Id. at 44.)   He describes his accompanying declaration as an "extensive, detailed, and

comprehensive time line and factual exposition" that supports his twenty-seven allegations of

ineffective assistance.  (Id. at 45.)[2]

---

[2]        Reiner has filed very lengthy pleadings in this proceeding. I have done my best to coherently but comprehensively set forth his § 2255 claims. In his memorandum in opposition to the United States' motion for summary dismissal, Reiner allows that his declaration accompanying this opposition memorandum sets forth "the critical evidence that Reiner's trial counsel failed to present at trial." (Pet'r Mem. Opp'n Gov't Mot. Summ. Dismissal at 13.)   He also links the facts set forth in that memorandum to the reason why the court should grant his motion for discovery.  (Id.)   As a consequence of Reiner's emphasis on his declaration and the connected issue of whether or not he is entitled to further discovery based on his assertions made therein, I have set forth the following

The declaration has one-hundred seventy-five paragraphs many of which are pinned to Reiner's insistence that from the time of Joel Lehrer's death until the club closed in June 2004, he believed he owed "significant professional ethical duties" to the Lehrers' estate, the estate's administrator, DHC and K&D Realty Trust. (Reiner Decl. ¶ 28.)   For instance he maintains:

> The government's case against me relied on allegations that I played a lead role in the alleged prostitution and money laundering conspiracy by being the de facto manager of the DHC.  I was nothing of the sort.  I did nothing more than function as the DHC's outside attorney performing legitimate legal work for the business, which included ensuring that it was functioning in conformance with the law.

(Reiner Decl. ¶ 38.)  He opines:

> During his representation of the DHC from 2001-2004, Reiner spent an average of only two (2) hours per week on DHC matters, representing a mere 7% of his total weekly billable time.  Reiner's trial counsel similarly failed to clearly present to the Court and the jury the nature of Reiner's role as DHC counsel, i.e., that he merely answered questions, and advised and recommended on issues pursuant to his client's instructions and authorizations, and only upon their request.  He had no independent discretion or autonomy to take action on behalf of the DHC without Mrs. Manzoli, Susan Lehrer, or Russell Pallas.[3]  He had no ownership interest or direct managerial or other authority over the DHC, its owners, the Trust beneficiary (Mrs. Manzoli) the DHC's manager (Pallas) or the DHC's massage attendants and employees.[4]

(Pet'r Opp'n Gov't Mot. Summ. Dismissal at 48.)

Further, he contends that he did not walk away from the club for the very reason that he sought to protect the women involved in the operation.  (Reiner Decl. ¶ 60.)  He insists: "Many of the actions I took on behalf of the club were intended to protect the women whether from themselves, or from others."  (Id. ¶ 65.)  Reiner paints himself as "on the lookout for evidence of

---

summary of his claim by relying primarily on the declaration but cross referencing the parts of his other pleadings that reiterate or support the contentions made in his declaration.

[3]      (citing Reiner Decl. ¶ 51.)

[4]      (citing Reiner Decl ¶ 45.)

potentially illegal conduct" at the club since the mid 1990s.  (Id. ¶ 85.) [5]  He states that after Joel

Lehrer's death he counseled Susan Lehrer and Mrs. Manzoli to sell DHC. (Id. ¶ 36.) [6]  "I felt it

was my duty to ensure that the DHC and its employees and contractors operated and conducted

themselves in a lawful manner,"  Reiner reflects, "and that the internal rules and regulations of

the DHC were followed and that all applicable federal, state and local laws and regulations were

complied with as they pertained to the operation of the corporate form and the provision of

relaxation rubs as a massage parlor."  (Id. ¶ 31.) [7]  "If my oversight failed in some respects to

prevent the activities of the women who worked as massagers at the Danish Health Club," Reiner

opines, "I accept that responsibility, but that doesn't equate to any criminal intent on my part

regarding that failure."  (Sec. 2255 Mot. at 6b, Doc. No. 1 at 10.)  He recounts two specific

incidents in which he participated in investigating as counsel for the club towards the ends of

assuring that no prostitution was taking place on the site.  (Reiner Decl. ¶¶ 86-93.)[8]

Reiner also recounts his interactions with Chief Strong and Detective Avery in

investigating alleged incidents of illegal activity at the club.  He maintains:

> If my counsel had called Chief Strong and Detective Avery to testify at my trial, I
> am confident that they would have confirmed and expanded upon the facts
> discussed in the Chief's conclusion that, although there was suspicion that
> prostitution was occurring at the DHC (a suspicion I shared), there was
> insufficient credible evidence to warrant prosecution or otherwise shut down the
> DHC. These conclusions were communicated to me either by Chief Strong or by
> Detective Avery, and I relied on them when conducting my own internal
> investigations of these allegations.  This evidence, if it were presented at trial,
> would have refuted the government's contention that I was willfully blind to what

---

[5]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 48, 50.)

[6]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 47.)

[7]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 47.)

[8]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 50.)

> was going on at the club, since it shows that I was communicating and
> cooperating with law enforcement with respect to the prostitution issue.

(Id. ¶100.) [9]   In a related paragraph, Reiner points to a report by the Maine Attorney General's

office issued after his trial and sentencing[10] finding no evidence of improper conduct by Chief

Strong or the Kittery Police Department in their investigation of the club or their dealings with

Reiner.  (Id. ¶ 101.)  "My attorneys," Reiner complains, "never attempted to use this report as

newly discovered evidence to demonstrate that I had a right to rely on what Chief Strong,

Detective Avery and others told me with respect to whether there was credible evidence of

prostitution occurring at the DHC, which would have directly rebutted the government's

contention that I was being willfully blind to what was going on."  (Id.)[11]   He insists that his

attorneys could have established that his "vision was obstructed by the acts and omissions of the

Federal and State law enforcement agencies" with which he was in willing contact.  (Sec. 2255

Mot. at 6b, Doc. No. 1 at 10.) [12]

Reiner also explores the issue of his knowledge of whether or not the arrangements he

was involved with for satisfying the Town of Kittery's ordinance requiring masseuse licensing

via a 500-hour course were a sham. (Reiner Decl. ¶¶ 106- 111.)   In particular, Reiner focuses on

---

[9]      (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 48-50, 64, 66.)

[10]      In his memorandum opposing the United States' motion for summary dismissal Reiner states:
>           Even if the Government is correct that Reiner's counsel did fail to call Strong for tactical
>   reasons (of which there is no evidence in this case), that reason evaporated when the Maine
>   Attorney General's office issued a report after Reiner's conviction which concluded, in spite of
>   Reiner's friendship with Strong, that there was no evidence that the Kittery Police Department or
>   Chief Strong engaged in any improper conduct in their various investigations of the DHC or in
>   their dealings with Reiner. … However, Reiner's counsel never used this report as newly
>   discovered evidence to demonstrate that Reiner had a right to rely on what Chief Strong, Detective
>   Avery and others told him regarding whether there was sufficient, credible evidence to support a
>   prosecution.
(Pet'r Opp'n Gov't Mot. Summ. Dismissal at 65-66)(emphasis added).
[11]      (See Sec. 2255 Mot. at 6a, Doc. No. 1 at 9; Sec. 2255 Mot. at 6c ¶h, Doc. No. 1 at 11; Pet'r Opp'n Gov't
Mot. Summ. Dismissal at 47-49)
[12]      (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 51-52.)

an investigation of the Northeast Institute of Whole Health which some of the DHC attendants enrolled in to get the 500-hours of training. He maintains that he had no reason to believe that this institute was selling certificates or requiring less than the completion of the full 500-hour training course. (Id. ¶110.) He believes that his attorneys could have called the directors of the school to testify in rebuttal of the testimony of two club employees that they did not attend the required number of classes at the school but still were certified. (Id. ¶¶110, 111.)

Reiner has lots of discontents with Pallas's testimony. For instance, he opines:

> Although Pallas stated in his trial testimony that the DHC's "no sex" rule was not disciplined, this simply was not true. Each and every incident that involved alleged sex for money was sternly disciplined. If we were able to identify the massage attendant involved, they were disciplined by terminating their association with DHC. If Pallas knew of any other incidents of misconduct by the massage attendant, he never told me, and any failure to discipline them was entirely his responsibility.

(Id. ¶ 144; see also Pet'r Opp'n Gov't Mot. Summ. Dismissal at 61.) Reiner insists he asked Pallas to conduct investigations of several disruptive incidents at the DHC and Pallas would write reports describing his investigation and the results, reports on which Reiner relied. (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 50, 61; Reiner Decl. ¶¶ 142, 143, 159.) Reiner also maintains that Pallas lied when he testified that Reiner knew that condoms were being used at the club and had been shown them by Pallas; Reiner insists that he "had never seen a single condom at the club" over the course of his representation. (Reiner Decl. ¶ 145.) He thinks his attorneys should have called the DHC cleaning lady to corroborate "that condoms were not in notorious use at the DHC" and that "she never saw any new or used condoms, sex toys, or pornography." (Id. ¶ 146.)[13]

---

[13]    (See Sec. 2255 Mot. at 6a, Doc. No. 1 at 9; Pet'r Opp'n Gov't Mot. Summ. Dismissal at 57-58.)

Vis-à-vis the paragraphs of his declaration and portions of his other pleadings that most directly fault his attorneys' representation, Reiner maintains his attorneys:

- Failed to pursue or produce evidence that once Reiner discovered various internet postings involving the club he discontinued advertising in "Xtreme Magazine." (See Sec. 2255 Mot. at 6a, Doc. No. 1 at 9.)
- Did not present evidence that when Reiner learned about the federal government's investigation he immediately contacted Chief Strong and told him he was available to talk to investigators and provide information. (Id.; Sec. 2255 Mot. at 6c ¶g, Doc. No. 1 at 11[14]; Pet'r Opp'n Gov't Mot. Summ. Dismissal at 48.) He believes that Chief Strong could have given a time-line for investigations into the DHC and confirmed that up until the 2004 raid there had never been sufficient evidence to make an arrest. (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 65.)
- Did not provide expert testimony on Reiner's duties and responsibilities to the estate of Joel Lehrer and to Susan Lehrer to explain his services to DHC after Joel's death. (See Sec. 2255 Mot. at 6c ¶d, Doc. No. 1 at 11.) Reiner contends that this expert could have "explained to the jury what motivated Reiner to take the actions that he did to advise the DHC, and personally ensure that its taxable revenue was accounted for and deposited safely in the bank." (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 67.) He also contends that this expert could have explained that the substantial sums of money earned by the DHC was not a red flag for elicit activity. (Id. at 68.) Reiner believes that if his attorneys had adequately explored the prospect of an expert this Court would not have enhanced his sentence due to Reiner's alleged leadership role. (Id.; Sentencing Tr. at 33.)
- Should have challenged testimony at trial that he knew or should have known that the DHC attendees' 'boyfriends' or adult entertainment 'talent agents' were in fact pimps (Reiner Decl. ¶¶ 112-114,130-133, 136-142, 160 ) with a particular focus on George Chandler (id. ¶¶ 116-122, 134, 160) and Lance Williams (Id. ¶ 123-129, 135). [15] He opines that if the Government was not able to use its superior investigative resources[16] to uncover sufficient evidence to charge these individuals apropos the prostitution conspiracy, how could Reiner reasonably been expected to know that prostitution was going on at the DHC during the approximately two-hours of work time he devoted to DHC each week? (Id. ¶ 161.)
- Should have confronted Richard Emery on cross-examination more effectively, such as exploring about how he purportedly had moral qualms about working at the massage parlor when he had been a customer at the DHC and paid for sex there and wished to remain a customer when he was working there. Reiner believes that his attorneys could have got Emery to admit that he initially told investigators that Pallas was the 'boss' and Reiner was the attorney for Joel Lehrer's estate, thereby demonstrating how his trial

---

[14]     Apparently Strong contacted the FBI in Portland and was told by an officer that he was unaware of any investigation into the DHC. (Id.)

[15]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 48, 51-52.)

[16]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 65.)

testimony changed and embellished Reiner's role. (Id. ¶ 147.) [17]  He also believes that counsel should have confronted Emery as to his vulnerability of being fired from his security clearance job at the Portsmouth Naval Shipyard if he had been convicted of a felony. (Id.; Pet'r Opp'n Gov't Mot. Summ. Dismissal at 64.)

- Submitted a twenty –person witness list but when the prosecution rested the defense presentation was limited to the testimony of Detective William Hackett of the Kittery Police on the requirements of the Kittery Massage parlor ordinance and Reiner's own testimony which, together took only three-and-one-half hours. [18]  Reiner had expected his counsel to call the other nineteen witnesses including Chief Strong, Detective Avery, Gabrielle Grigore of the North Eastern  Institute of Whole Health, Ms. Rosa Estelle Schlieman (the cleaner) (id. ¶ 148), York County District Attorney Michael Canterra, and IRS attorney Katherine Boyle (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 64).[19]  He states: "To the jury, Reiner's counsel certainly appeared to capitulate and throw in the towel."  (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 55 -56.)

- Should have called Robert Bruno -- an outside accountant for DHC, K&D Realty Trust, and Mrs. Manzoli – with whom Reiner discussed the need to accurately track the club's revenues and deposits and contain costs.   According to Reiner, Bruno could have confirmed the need for the DHC and K&D Realty Trust revenues to cover tax obligations of the Joel Lehrer estate and confirmed that Reiner reviewed DHC business records to assure compliance with internal financial controls, in furtherance of Reiner's "ethical and fiduciary duties as attorney for the Estate of Joel Lehrer."  (Reiner ¶¶ 149- 151.)  Bruno could also testify that it would have been reasonable for Reiner "to be interested in ensuring that all revenue of the DHC was captured, recorded and deposited in the bank so that taxes could be paid and an IRS audit could be avoided, in furtherance of [Reiner's] professional duties" for the estate.  (Id. ¶ 152.)[20]

- Should have called Thomas Ainsworth, an attorney hired, on Reiner's suggestion, by Joel Lehrer a year before Lehrer's death.  Ainsworth "would have testified that he had independent contact and access to the DHC, its owners and staff, and that he did not detect any illegal activities."  (Id. ¶¶ 153, 154.)[21]

- Should have called IRS attorney Katherine Boyle, who led the tax audit on the Lehrer estate,  "to confirm the need for Reiner and the DHC to be extra vigilant on tax matters."  (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 47; Reiner Decl. ¶175.)

-  Had witness statements from approximately ten of DHC's customers on premises on the day of the June 2004 raid.  One half of these customers told authorities that they did not go to the club for sexual services but only to obtain a relaxation rub and use the spa

---

[17]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 63.)

[18]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 54-55.)

[19]     (See Sec. 2255 Mot at 6c ¶¶ b, c, Doc. No. 1 at 11.)

[20]     (See Sec. 2255 Mot. at 6b, Doc. No. 1 at 10; Pet'r Opp'n Gov't Mot. Summ. Dismissal at 58-59.)

[21]     (See Sec. 2255 Mot. at 6a, Doc. No. 1 at 9; Pet'r Opp'n Gov't Mot. Summ. Dismissal at 59-60.)

facilities. Reiner faults his attorneys for allowing the prosecution to present four or five DHC customers who indicated they had sex with attendants while not calling those customers who had given statements favorable to the defense. (Reiner Decl. ¶ 155.) [22] He highlights the content of the reports of two particular customers and also faults his attorneys for not following through to investigate further additional customers contacted by law enforcement. (Id.) [23] "The Government attempts to minimize Reiner's counsel's deficient performance," Reiner asserts, "by speculating, without pointing to a shred of evidence, that his counsel failed to call them out of concern that, faced with perjury charges, they would have recanted their prior statements that they did not have sex at the DHC, and testify instead that they did." (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 56.)

- Should not have called Reiner as a witness without first laying the foundation with other defense-favorable witnesses that would have bolstered his testimony. (See Sec. 2255 Mot. at 6c ¶e, Doc. No. 1 at 11.)
- Did not conduct adequate cross-examination of government witnesses [24] such as Cheryl Vinton and Tara Morales, in particular, on their original denial of prostitution and mischaracterization of their relationship to their pimps. (Reiner Decl. ¶ 156.) [25]
- Failed to address with Pallas the fact that he kept DHC records at his home and confront and cross-examine him on his role within the DHC. He cites to memos provided by the prosecution which confirmed that Pallas was managing the club, claimed rights to the office behind the front desk, scheduled shifts, took the initiative to take over Susan Lehrer's responsibilities, checked, along with Susan Lehrer, directly with Mrs. Manzoli (and not Reiner) on matters with Pallas's purview, and sought to shore-up/secure back-up for his authority to enforce his rules. (Id. ¶ 159.) [26] Reiner also maintains that these records kept at home by Pallas could have provided names and contact numbers for DHC employees, attendants, and applicants towards establishing that Reiner met with "each attendant separately to discuss (and make sure that they understood) the DHC's rules and the town's massage ordinance. [27] They "could also corroborate the fact that [Reiner] told each of them that they should only be giving customers relaxation rubs, and if any customer asked for anything else, or if they were being harassed or pressured to provide sexual favors, then if they couldn't tell anyone at DHC, they should feel comfortable telling [him]." (Id. ¶ 159; see also id. ¶ 65.) [28]

---

[22]   (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 11, 56.)

[23]   (See Sec. 2255 Mot. at 6a, Doc. No. 1 at 9.)

[24]   (See Sec. 2255 Mot at 6c ¶a, Doc. No. 1 at 11.)

[25]   (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 7, 46, 57.)

[26]   (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 61-62.)

[27]   (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 50, 52-53, 61.)

[28]   (See Sec. 2255 Mot. at 6c ¶f, Doc. No. 1 at 11; Pet'r Opp'n Gov't Mot. Summ. Dismissal at 11, 60-61.)

11

- Did not cross-examine the government witnesses who worked in the club towards establishing that they worked there before the period of Reiner's involvement charged and to bring out that he had repeatedly cautioned and advised these government witnesses against the performance of unlawful activity.  (See Sec. 2255 Mot. at 6c ¶ k, Doc. No. 1 at 11.)

- Did not try to demonstrate that Reiner had advised the club's management and ownership to terminate the employment of half of the club's attendees out of the number that were working between the time of Joel Lehrer's death and the June 2004 raid by law enforcement.  (See Sec. 2255 Mot. at 6d ¶ l, Doc. No. 1 at 12.) [29]

- Did not pursue a line of questioning with Pallas relating to Pallas's request that Russell Aharonian – an owner of a next door massage therapy business – to patronize the DHC to determine if the attendants were providing skilled, competent relaxation rubs to customers.  According to Aharonian, who was interviewed by the defense's investigator, he reported back favorably on several occasions and said that he had not been solicited for sex or offered an ala carte menu of sexual services.  (Id. ¶ 163.) In Renier's view this line of inquiry would have undermined the United States' theory that DHC was a front for prostitution because doing this kind of quality control would be inconsistent with that kind of operation.  (Id. ¶ 164.) [30]  "In addition," Reiner complains, "Aharonian told our investigator that he had told federal investigators of his testing of the DHC's massage attendants, but the government never turned over to my defense team any of this exculpatory evidence."  (Id. ¶ 165.)[31]

- Failed to bring out through Mrs. Manzoli's testimony that after the death of Joel Lehrer she interacted exclusively with Mr. Bruno to prepare the tax returns for both the DHC and the Trust, without Reiner seeing them or signing them as co-trustee.  (Id. ¶ 173.) [32] He adds that if his attorney had called him as a witness Mr. Bruno could have confirmed that this was the case.  (Id.)

- Failed to object to the forfeiture order based on an interpretation of evidence of Reiner's billing record used at trial but not placed in proper context.  (See Sec. 2255 Mot. at 6c ¶ j, Doc. No. 1 at 11.)  He explains that he never met with club worker JB about anything to do with prostitution and he could have explained that if asked.  (Id.; Pet'r Opp'n Gov't Mot. Summ. Dismissal at 69.)  Furthermore, Reiner complains, "the Court relied on billing records from Reiner's law practice to expand the time period during which Reiner was liable for forfeiture from October 2002, when Joel Lehrer died, to more than two years prior to January 1999."  (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 68.)

- Did not attempt to provide expert evidence to contest the search warrant and to present to the jury that nationally recognized financial publications on successful businesses

---

[29]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 48, 61; Reiner Decl ¶¶ 77-84.)

[30]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 62-63.)

[31]     It seems that the Government's alleged nondisclosure could not have prejudiced the defense given that his investigator sussed this out for the defense.

[32]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 8.)

recognize that gross revenues of a million dollars or more at individual lawful massage businesses is not unusual.  (See Sec. 2255 Mot. at 6d ¶ m, Doc. No. 1 at 12.)

- Did not call witnesses at Reiner's sentencing to establish that other individuals were more culpable than Reiner but, nevertheless, these individuals were either not prosecuted or received significantly less severe sentences.   (See Sec. 2255 Mot. at 6d ¶ n, Doc. No. 1 at 12.)[33]  Reiner feels as though his sentence in comparison shows that he was not punished for the seriousness of the crime but for his failure to admit culpability and assist the prosecution. (Id.; Sec. 2255 Mot. at 6d ¶ o, Doc. No. 1 at 12.)

- Failed to point out that the resolution of this case left the owner of the DHC with significant assets derived from prostitution while Reiner was subject to an "enhanced penalty" based on funds that were not received from DHC operations.  (Sec. 2255 Mot. at 6d ¶ p, Doc. No. 1 at 12.)

- Did not argue on the basis of Gall v. United States, 552 U.S. 38  (2007) and Kimbrough v. United States, 552 U.S. 85 (2007) that the court should credit his character and accomplishments instead of focusing on the nature and seriousness of his crime.  (See Sec. 2255 Mot. at 6d ¶ q, Doc. No. 1 at 12.)

- Failed to convey to Reiner "accurately and fully" the terms of all plea negotiations. (See Sec. 2255 Mot. at 6d ¶ s, Doc. No. 1 at 12.)  Specifically, his attorneys never told Reiner that he could have received a sentence of house arrest or only six-months of incarceration like those afforded Mrs. Manzoli and Mr. Pallas.   (Id.; Sec. 2255 Mot. at 6f at 2, Doc. No. 1-1 at 2-3.)

With respect to how he thinks his verdict and sentence might have been different if his attorneys had performed differently in all these areas, Reiner insists that this evidence would have rebutted the prosecution's theory of willful blindness on Reiner's part. (Sec. 2255 Mot. at 6b, Doc. No. 1 at 10.) [34]  Reiner asserts:

> Because the jury and the Court were left with the government's unrebutted contention that the DHC was merely a front for prostitution, this resulted in the jury rejecting my "good faith" defense, and also caused the Court to improperly impose on me a forfeiture order requiring me to disgorge the entire $3.9 million amount of revenue, from 2000 through 2004, based on the mistaken belief that DHC was not meant to be a legitimate business that attracted customers to use its health club amenities.

---

[33]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 7.)

[34]     (See Pet'r Opp'n Gov't Mot. Summ. Dismissal at 46.)

(Reiner Decl. ¶ 157.)  Reiner speculates that "the government apparently persuaded defense counsel to let it put on it[]s case with relatively little objection or rebuttal offered by the defense other than a minimum amount of direct testimony offered through the defendant himself, without defense counsel offering any of the multitude of supporting evidence that would have confirmed and supported the defendant's credibility." (See Sec. 2255 Mot. at 6e, Doc. No. 1- 1 at 1.)  "Had the Court known of defense counsel's shocking failures to adequately and effectively represent Reiner," he insists, this Court "would have undoubtedly had a dramatically different viewpoint" with respect to whether or not defense counsel presented Reiner's case professionally.  (Pet'r Opp'n Gov't Mot. Summ. Dismissal at 8.)

Having reviewed Reiner's pleadings and heeded his factual and legal arguments I concluded that the only realistic manner of addressing his numerous assertions of counsel error is through the lens of a cumulative ineffective assistance challenge.[35]   In other words, I don't view any one of his specific points of discontent as meeting the Strickland prejudice standard.[36]  "'Strickland clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced.'" Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005) (quoting Kubat v. Thieret, 867 F.2d 351, 370 (7th Cir.1989)).  An aspect of the inquiry of Strickland prejudice apropos such cumulative claims is "the strength of the prosecution's properly admitted evidence." Smith v. Thompson, No. 08-1425, 2009 WL 1285839, 4 (1st Cir. May 11, 2009) (unpublished opinion).

---

[35]      The United States' response to the 28 U.S.C. § 2255 motion diligently dissects the claims with great specificity.  I know the Court will consider that memorandum and the United States ' response to Reiner's motion for discovery if Reiner objects to this recommended decision.

[36]      I address the issues of Reiner's attorneys' challenge to the forfeiture judgment at some length below.

The overriding theme running through all the identified shortfalls of counsel is the issue of whether or not counsel could have developed witness testimony concerning Reiner's alleged undertakings to proactively counsel attendants against selling sex -- in fulfillment of his obligations to his clients -- and his defense to the Government's theory of willful blindness.[37]  It is quite clear from the trial transcripts and the transcripts of the closing argument that counsel honed in on this theory of the absence of willfulness.  Related to this is Reiner's insistence that counsel's representation that there were twenty potential witnesses in addition to Reiner for the defense during jury selection and the court's indication that the trial might take as many as eleven days served to further prejudice his case.  Without an evidentiary hearing it is not possible to divine why counsel elected to limit defense witnesses but given the fact that they had identified these witnesses and assured their names were 'vetted' during jury selection, I am pretty confident that this approach, implemented after full consideration of the United States' case, was thought through and strategic.  Given the fact that this record bespeaks a vigorous challenge to the United States' theory of willful blindness, I cannot credit Reiner's assertion that

---

[37]       The instruction given on this was:

> The defense has asserted that Gary Reiner acted in good faith. Good faith may be inconsistent with the requirement in certain counts that a defendant acted with a culpable statement of mind; i.e., willfully, knowingly or with a particular intent.
>
> If after considering any evidence of good faith, together with all of the other evidence, you have a reasonable doubt as to any count that Gary Reiner possessed the required state of mind; i.e., willfully, knowingly or with a particular intent as the case may be, then you must find him not guilty of that count.
>
> You may infer that Gary Reiner had knowledge of a fact if you find that he deliberately closed his eyes to a fact that otherwise would have been obvious to him. In order to infer knowledge, you must find that two things have been established.
>
> First, that Gary Reiner was aware of a high probability of the fact in question. Second, that Gary Reiner consciously and deliberately avoided learning of that fact, that is to say, that Gary Reiner willfully made himself blind to that fact.
>
> It is entirely up to you to determine whether he deliberately closed his eyes to the fact, and if so, what inference, if any, should be drawn.
>
> However, it is important to bear in mind that mere negligence or mistake in failing to learn the fact is not sufficient, and there must be a deliberate effort to remain ignorant of the fact.

(Trial tr. at 1004-1005.)

the defense cut some sort of deal with the prosecution and just folded the tent in the final three and one-half hours of trial.

Reiner maintains that his attorneys did not adequately advise him vis-à-vis his plea bargaining options. I take Reiner's contention that he would have been open to a plea deal with a grain of salt based on my reading of the entire record of the criminal proceedings and his persistent narrative in his 28 U.S.C. § 2255 pleadings.   Furthermore, Mrs. Manzoli's and Pallas's sentences were adjudged after Reiner went to trial so it would have been difficult to make a strong argument on this score vis-à-vis plea negotiation.  It is also clear from the record that Reiner's attorneys did argue at sentencing that Reiner should receive a sentence similar to one he would have received under a plea bargain, but this Court rejected that contention.   Based on this record, the Strickland performance showing is insufficient.

In setting the preceding analysis forth I am not deaf to Reiner's claim that he acted in good faith and was intent on exercising his fiduciary responsibilities in assuring that the illegal activity at the club did not continue.  Reiner's defense was, and remains, that he was not liable because he had a good faith basis -- seasoned with some suspicion **--** for believing the DHC was operating a lawful relaxation massage business, albeit a lawfulness that was tainted by some attendants who were operating outside of protocol.   However, there was a jury trial and the jury concluded that Reiner was guilty despite his counter contentions.

I heed the Supreme Court's caution in Strickland: "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689. "There are countless ways to provide

16

effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id. (citing Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983)). Strickland noted:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

Id. at 690.

In short, there may have been wiggle-room with respect to how the defense framed and advanced its case, but for me this record does not begin to suggest the sort of performance shortfall that would warrant a conclusion – or further evidentiary inquiry into the proposition – that counsel performed below the Sixth Amendment standard.  That said, the judge reviewing this recommended decision will be the judge who presided over the lengthy criminal proceedings and it may be that Reiner's quite specific complaints about counsel's performance might convince him that further § 2255 inquiry is appropriate.  See McGill, 11 F.3d at 225.

### 2. **United States v. Santos,** 553 U.S. 507 (2008) Claim and Reiner's Related Ineffective Assistance of Counsel Complaint

Perhaps the most tenable aspects of Reiner's enumerated discontents with counsel relate to the adequacy of efforts to minimize his exposure apropos the forfeiture order.[38]  In his

---

[38]      The United States acknowledges that Reiner is seeking to vacate his conviction under Count Seven as well as attacking the forfeiture judgment.   (Gov't Mot. Summ. Dismissal at 10.)  It has not argued that Reiner's forfeiture related claims are not cognizable in this 28 U.S.C. § 2255 proceeding. There is some case law that suggests that a 28 U.S.C. § 2255 proceeding is not a road-worthy vehicle for challenging the forfeiture component of

memorandum in opposition to the United States' motion for summary dismissal, Reiner adds the

following complaint:

> Perhaps the clearest example of the ineffective assistance of Reiner's counsel is demonstrated in the following chronology that is actually documented in the pleadings and ruling in this case.
>
> On October 14, 2005, in an[] on-the-record telephone conference with all parties, but absent the defendant, the lawyers agreed there was no need for additional evidence on the issue of forfeiture.   Nevertheless, on October 26, 2005, in response to the court's October 24, 2005, Procedural Order, counsel for Reiner suggested calling seven witnesses on the issue of the amount of the forfeiture: five customers, who denied receiving sexual favors for money at the DHC; the federal agent who interviewed the customers; and two witnesses who would testify to the need to have legal counsel comply with the requirements of the federal estate tax and state issues; value of items in the Estate of Joel Lehrer; credit towards forfeiture obligation based upon the legitimate attorneys fees and personal representative fees incurred in managing and maintaining estate; credit toward forfeiture obligation based upon estate tax assessed by the federal government.  On October 31, 2005, the court concluded that the evidentiary record, on the issue of forfeiture, was closed as of October 14, 2005, and that Reiner, through his lawyers, waived his right to present additional evidence.  The judge expressed his frustration, "my role is to determine whether the Government has met its burden, not to instruct the defendant whether to present more evidence."

(Pet'r Opp'n Gov't Mot. Summ. Dismissal at 53-54.)  ).  In his declaration[39] he includes the

following paragraphs pertaining to the proceeds factual question:

> I am not aware of any evidence introduced at my trial that I undertook <u>any</u> transaction involving the DHC's proceeds, in the form of profits.  I merely ensured that the DHC's gross receipts were all properly  accounted for and deposited in the bank, so that they were available to pay the DHC's expenses, most importantly, from my p[er]spective, any taxes due for the Estate of Joel Lehrer.  In fact, all local, state and federal estate and income taxes for the Estate of Joel Lehrer, and income taxes for the DHC and K&D Realty Trust were paid,

---

a sentence.  <u>See</u> <u>Rodriguez v. United States</u>, No. 95-2322, 1997 WL 770636, 1 (1st Cir. Dec. 12, 1997) (unpublished);  <u>Clark v. United States,</u> 913 F. Supp. 441, 444 -45 (E.D. Va. 1995);  <u>McGee v. United States</u>, No. 1:08-cv-499, 2010 WL 310770, 2, 7 (W.D. Mich. Jan. 21, 2010);  <u>Soldier v. United States</u>, Crim.  No. 3:06-cr-131-02, Civ.  No. 3:09-cv-1, 2009 WL 455830, 2 (D.N.D. Feb. 23, 2009).  However, in this particular case the United States has not questioned that aspect of this motion and because Reiner clearly remains 'in custody' for purposes of habeas review he does have standing to bring this motion.  As a consequence, I address the substance of the forfeiture related challenges.

[39]      (Pet'r Opp'n Mot. Summ. Dismissal at 15- 44.)

and to my knowledge, no tax deficiency for any of those entities exist. (Reiner Decl. ¶ 170.)

I had no contact with any of the profits of the DHC that would constitute its "proceeds" net of expenses, and there was no evidence that I did.  I had nothing to do with the setting or payment of the DHC's rent to the K&D Realty Trust.  Mary Ann Manzoli (if she were asked) and Robert Bruno (if he were called to testify) would have verified that I had no control or authority over the finances of the DHC or the Trust.  In addition, I never had any discussions with Mrs. Manzoli about what was done with any of the money that was received by the K&D Realty Trust for the DHC or from rental properties that it owned.  (Id. ¶ 171.)

Although I received bank statements for the DHC and the Trust in my role as the attorney for the Lehrer Estate, Mrs. Manzoli forbade me to open them.  I complied with her instructions and always turned them over to her unopened. (Id. ¶ 172.)

I, therefore, retained none of the DHC's profit proceeds, nor did I pay any of the DHC's expenses (which was Mrs. Manzoli's exclusive responsibility), nor did I use any of these proceeds to acquire any other property or asset for the DHC or the Trust.  The legal fees I collected providing legal services (the legitimacy of which was never challenged) were de minimus. (Id. ¶ 174; see also id. ¶ 175.)[40]

This aspect of Reiner's ineffective counsel claim ties so directly in with his legal challenge under Santos that I address them together.

One might think that given this Court's two prior published decisions on forfeiture and the First Circuit's discussion of Reiner's forfeiture-related challenge on direct appeal, this matter could be easily laid to rest. But I address the matter out of an abundance of caution and because the forfeiture obligation seems to be the looming monster in Reiner's case given his near completion of his sentence.

On the last day of trial, after the jury had been remanded to its deliberations, counsel and the Court discussed the issue of the forfeiture counts.   The focus first was on whether or not Reiner was entitled to a jury determination in view of the fact that the United States was seeking a money judgment and was not proceeding against specific property. (Trial Tr. at 1045-65.)  The

---

[40]        (See Sec. 2255 Mot. at 6c ¶i, Doc. No. 1 at 11.)

Court concluded that the defendant only had a right to a jury nexus determination "when specific property is being sought by the forfeiture, not when a money judgment is being sought." (Id. at 1064.)  The Court also observed that there was still potentially a legal argument to be made and considered as to whether a money judgment is available in lieu of specific property, proceeds, and the like, just as is the matter of the amount of the forfeiture judgment. (Id.)

After the jury returned its guilty verdicts a hearing reconvened on the forfeiture issues. The United States presented the testimony of IRS Agent Giguere which focused on the forfeiture amount for Count Three and the amount of money linked to Tara Morales's work at the DHC. (Id. at 1072-90.)  Agent Giguere based his calculation of $745,200 for this count on Morales's testimony at trial that she had four to five clients per day and averaged $200 per client. (Id. at 1078-80.) On cross-examination defense counsel questioned the witness on why he did not substantiate the Morales figures by looking at the DHC sheets that recorded the number of times an attendant would see a customer. (Id. at 1085-89.)  The agent conceded that this would have been a more precise form of calculation. (Id. at 1085-86.)  Defense counsel indicated that he would like the opportunity to examine the witness on these slips (id. at 1087), a request that the United States did not oppose (id. at 1090).  Defense counsel made it clear that he did not wish to put on any evidence at that juncture. (Id. at 1090).  The Court then indicated:  "I will allow you to examine the slips and then notify the Court whether you wish to have additional evidence to your presentation or not." (Id.)  The prosecutor indicated, "with respect to Counts One, Two and Seven, it sounds as though the issue with respect to additional evidence would only be on the count that involved Tara Morales, which is Count Three." (Id. at 1092.)

There was then an agreement that the Court could enter a preliminary order that the defense not spend or transfer or remove any funds in excess of $5000.  (Id. at 1097-98.) However, in the process of reaching this accord defense counsel made it clear that they saw

> a significant legal issue as to whether the forfeiture would go against Mr. Reiner for proceeds received by the club as compared to those that he personally received through the law firm, and I think that would be appropriate to us to have an opportunity to brief the issues, and provide the Court with our thinking and legal citations that may be appropriate and relevant to that issue.

(Id. at 1094.)  The Court inquired of one of the prosecuting attorneys whether he would be open to the Court's re-examination of this concern if persuaded by the legal arguments made by the defense.  (Id. at 1096.)   The prosecutor, as part of his response, relayed his belief that the government was "entitled to money judgment on all the proceeds generated by all the defendants and co-conspirators in the criminal activity that was jointly undertaken." (Id. at 1097.)  It was clear at the close of proceedings on September 30, 2005, that defense counsel had an opportunity to make the legal arguments it envisioned.

And defense counsel did submit a five-page memorandum on October 4, 2005.  In this pleading he objected to the lack of the nexus between the property and the offense and asserted that "no forfeiture based upon Count Three may issue." (Def.'s  Mem. Re: Criminal Forfeiture at 2.)   Second, he maintained that the evidence was that Reiner had not joined the conspiracy until after Joel Lehrer's death in October 2001 and that his forfeiture should be accordingly limited.  (Id. at 3.)  Third, he asserted that the United States could not seek the forfeiture of legitimate income, to wit, Reiner's legal fees.  (Id.) He also insisted that the evidence at trial demonstrated that 20% of the money deposited in Ocean Bank was derived from lawful activity

and his forfeiture obligation should have been reduced by this proportion.  (Id. at 3-4.)[41]  And the

attorneys also resurrected the issue of IRS Agent Giguere's testimony at the forfeiture

proceeding asserting that his answers to cross-examination were a concession that his numbers

for Count Three "were based on unstudied assumptions, speculation, and conjecture."  (Id. at 4.)

In a footnote to this argument, defense counsel urges that this "issue about earnings should be

based on an opportunity to examine the witness as the amount of income they claimed with

respect to the filing of their tax returns and in relation to the number of customers it could be

documented they saw based on the records maintained by the club."  (Id. at 4 n. 3.)  The defense

opines that the records are in the possession of the government and, passively, suggests that they

should be examined and compared to the tax returns and testimony of the attendants of DHC

(id.), apparently on the notion that the United States bore this obligation.[42]   Reiner's attorneys'

final contention in this memorandum was an Eighth Amendment claim asserting the proposed

forfeiture was cruel and unusual punishment and/or an excessive fine.  (Id. at 4-5.)

    In an October 12, 2005, memorandum of decision and order this Court concluded that

there was no Sixth Amendment right to a jury trial on criminal forfeiture issues when the

government is seeking only an in personam money judgment.  United States v. Reiner, 393 F.

Supp. 2d 52 (D. Me. 2005).

    On October 14, 2005, this Court telephonically reconvened the forfeiture hearing on its

own accord, and prefaced the conference by articulating its confusion as to where the forfeiture

_____

[41]    In a footnote Reiner's counsel noted that it could have been along the lines of a 50—50 division had the
Government called, in addition to five customers who reported receiving sexual service, five customers who had
denied that they had to investigators.  (Id. at 4 n. 2.)
[42]    Defense also opines that "it should also be noted that only a small sampling of  the women who worked at
the club were presented for testimony."  (Id.)

issue stood procedurally.  (Oct. 14, 2005, Telephone Conference Tr. at 2, Crim. No. 04-127-P-H,

Doc. No. 266.)    The Court summarized:

> You will recall that after the verdict we had an evidentiary hearing but that
> we adjourned that at some point and I had the belief that you were going to confer
> and get back to me as to whether the defendant wished to put on additional
> evidence in light of what might be available in certain records concerning the
> number of visits paid to Ms. Morales et cetera, that was one issue.
>
> The second issue I was perplexed about was that I thought you were going
> to propose a briefing schedule on whatever were the legal issues on forfeiture. Of
> course I have received the memoranda you filed, read them and referred to them
> in my written decision on the jury trial issue.
>
> I was not clear whether that was the extent of the briefing that you had
> requested or where we stood on that. So that is the reason for the conference call,
> for me to find out where we stand on that. I also in a footnote raised an issue
> about burden of proof because I thought that possibly one of the counts had a
> different burden of proof than the other so far as forfeiture is concerned, and so I
> will be interested in any responses you have there.

(Id. at 2-3.)

One of Reiner's attorneys responded representing that the defense did not see a need for

further evidence on Count 3 because it was subsumed by the forfeiture amounts attendant on the

other counts.  (Id. at 3.)  The following exchange then took place between the Court, the

prosecutor, Mr. Clark, and defense counsel, Mr. Gordon and Mr. Christie:

> MR. CLARK: …      My understanding is the factual issue was that the defense
> wished to review certain roles of evidence which I think are government -- are in
> evidence already, and were put in evidence during the trial, and Government
> Exhibit 28. And my understanding is that Mr. Gordon no longer has a need to
> review those for purposes of making an argument with respect to that count. I
> think it is moot to the extent a larger money judgment is imposed.
> THE COURT: I'm not sure if moot is the right word. That is what I was trying to
> raise, so let me turn the question back to Mr. Gordon and see if I do fully
> understand. What I heard Mr. Clark say is that he is still seeking relief as to
> forfeiture on Count 3 but agrees that the maximum that will be recovered is the
> largest amount which is either Count 1, 2 or 7. But that he is still going forward, I
> think perhaps not seeking the relief, he is simply recognizing that if he is
> successful on 1, 2 and/or 7 they will be larger than any amount he might recover
> in count 3.
>
> Have I said that right, Mr. Clark?

23

MR. CLARK: That's correct, your Honor. In order to avoid any double counting we would not ask the Court to increase the amount.

THE COURT: Mr. Gordon, is that your understanding as well?

MR. GORDON: That is our understanding as well.

THE COURT: So you're saying in light of that you don't have need to put additional evidence on?

MR. GORDON: That's right because it would not alter what would be a larger forfeiture amount than under the other count.

THE COURT: Very well. Let's proceed to where we stand on the legal issues.

MR. CLARK: If I could be heard?

This is Don Clark. On the briefing issue I believe that we both agree that we have fully briefed the legal issues. I apologize to the Court, I recognize the Court asked for a briefing schedule and in lieu of that we were just communicating with the defense. They filed their brief and we filed our responsive brief a day later. They replied several days after that, so my understanding is that the briefing is completed.

THE COURT: There is no need to apologize, I wanted to know where we stood. Do you agree, Mr. Gordon?

MR. CHRISTIE: Your Honor, this is Bill Christie.

THE COURT: All right, Mr. Christie.

MR. CHRISTIE: I think in speaking with Mr. Clark before you came on the call, that the issue on Counts 1 and 2, the legal issue that is there is the government is seeking forfeiture of approximately 3.9 million. We believe the evidence would establish that there is a lower amount that is actually attributable to criminal proceeds, and that issue has been framed properly for the Court. We would agree that no further briefing is necessary.

MR. CLARK: I think that is referred to, your Honor, in the defendant's brief. In their opening brief, they argued that the amount should be reduced by 20 percent on page 4 of their brief. So I believe they have briefed that legal issue.

THE COURT: I don't have the brief in front of me right now. Can you just remind me how the 20 percent was derived?

MR. CLARK: If I may, your Honor, I will read it to you if that's okay. The testimony and evidence at trial indicated that approximately 80 percent of the revenue came from the Kittery Health Club and deposited in Ocean Bank was derived from criminal activity and that approximately 20 percent derived from lawful activity.

Accordingly, the total amount of forfeiture identified in the preliminary order of forfeiture (or a lower amount determined to defendant's Alman (sic) in the conspiracy reflected above) should be reduced by 20 percent.

THE COURT: Mr. Christie, is that the argument?

MR. CHRISTIE: That is the legal argument, your Honor.

MR. CLARK: I should point out to the Court there is also a footnote Number 2 in their brief in which they argue --

THE COURT: I do have the brief in front of me now. My law clerk has it and I do have footnote 2.

24

MR. CLARK: -- that it should be lower than that.

      The government's position is the trial evidence speaks for itself, that the government's witnesses and testimony and exhibits reflect that almost all of the activity at the Danish was illegal, and in violation of federal law and, as testified, unlawful activity, and therefore the money that was deposited in the bank account is forfeitable as proceeds and the monies in excess of $10,000 that were withdrawn from the account are forfeitable as money involved in money laundering transaction in violation of Title 18, United States Code section 1957.

THE COURT: While we are on that, let me just ask both of you about a question which I believe you addressed at that hearing but I want a little elaboration, and that is with respect to the opening dates. If I understand correctly, the number that the government proposes for Counts 1 and 2 is based upon total deposits going into Kittery Health Club starting August 23 of 2000 and ending with the closing of the club June 9, 2004. The amounts in Count 7 are based upon disbursements from the Kittery Health Club account January 4, 1999 and ending with the club closing June 9, 2004.

      My questions to you:

      1. Is that correct?

      2. If it is correct, remind me of the premise for those opening dates?

MR. CLARK: Those are correct, your Honor, and they are reflected in Government Exhibits F-1 and F-3 respectively. And the premise would be with respect to the deposits in the account, all of the money deposited into the account between August 23rd 2000 and June 9, 2004 were proceeds of the violations alleged in Counts 1 and 2. The date limitation is a function of the change in the statue pursuant to calendar 2000, which allowed the government to forfeit the proceeds of these violations criminally. They can do it civilly. The change of the law effective as of August 23rd 2000 limited the forfeiture in this case to that period of time.

      The forfeiture alleged or the forfeiture sought for the money laundering counts is broader than that because the money laundering forfeiture already existed prior to August 23rd of 2000. The essential argument that all of the funds that went into the Kittery Health Club account between January 1999 and June of 2004 were proceeds of this criminal enterprise; therefore, any funds that were withdrawn from that account over that period of time in excess of $10,000 are forfeitable.

THE COURT: And what is the significance of January 4, 1999?

MR. CLARK: That is just as far back as the bank records allow the government to trace this financial crime.

THE COURT: Thank you. Does the defendant want to make any comment on those questions?

MR. CHRISTIE: Your Honor, can we have a moment to confer?

THE COURT: You may.

MR. CHRISTIE: Your Honor, we think those dates are correct.

25

MR. CLARK: Judge, just so I can be clear, the statute which changed on August 23rd of 2000 was Title 28 United States Code section 2461(c) and that is set forth in the indictment.

THE COURT: Mr. Christie, let me come back to you. What did you mean in saying you think the dates are correct?

MR. CHRISTIE: The analysis-- you asked, as I understood your question, how the start dates were determined and the government went through its analysis. And we believe their analysis-- we understand how their analysis was determined and if that is the analysis that they are going on, we believe it is correct.

THE COURT: So that if I find the government is entitled to forfeiture, those would be the proper opening dates?

MR. CHRISTIE: Correct.

THE COURT: All right, counsel, I guess the only other question that I have for you and I'll entertain any questions that you have for me, is the status of the preliminary order. I think, Mr. Clark, you had perhaps e-mailed something to the clerk before then or may have been presented, in any event I no longer have it. What I would like you to do, if you could e-mail it to the clerk again with copies to defense counsel and see if there are any objections as to form, updating that, and I will determine the correct amount and then we'll proceed.

MR. CLARK: I will do that your Honor. Two things I will note: We are only seeking a money judgment. There was reference to publishing the preliminary order but that will no longer be in the proposed order. I just want to give defense a heads-up on that. Your Honor, I don't think we addressed one issue that the Court raised earlier, which had to do with the burden of proof on count 3. We do believe that the Court is correct that the burden of proof for the forfeiture alleged that a violation of Count 3 is beyond a reasonable doubt.

THE COURT: All right, and that reminds me of one other question. I can't remember what the preliminary order said but am I correct in believing that the government agrees that the forfeiture order here will be joint and several as to the other defendants or not?

MR. CLARK: It Absolutely will be. And the defendants do get credit for funds already paid.

(Id. at 4- 12.)

In Reiner's October 20, 2005, objection to the preliminary order for forfeiture, Reiner's

counsel argued as follows:

1. After trial in this matter, the defendant submitted two memoranda of law stating his objections to forfeiture in this matter.

2. On October 14, 2005, the Court held a telephonic conference regarding forfeiture issues in this matter. Counsel for the defendant again stated the defendant's objections to forfeiture in this matter.

26

3. After the October 14, 2005 hearing, the defendant received a draft Preliminary Order of Forfeiture and was invited to state his objections to the form of the draft order.

4. The defendant states the following:

    a. The amounts of the forfeiture for Counts 1, 2 and 7 reflect the total amount of proceeds and do not consider testimony at trial that approximately 80% of proceeds were derived from illegal conduct and approximately 20% of proceeds were derived from legitimate income. Accordingly, the amount of the forfeiture should be reduced by at least 20%;

    b. Although the draft order states that defendant's forfeiture obligation is joint and several with that of other co-defendants and co-conspirators, the order should also state, "the defendant is entitled to a credit on his forfeiture obligation for all monies and property obtained by the government from forfeiture proceedings involving the defendant's co-defendants and co-conspirators."

    c. The defendant incorporates herein, his previously stated objections, including, but not limited to the following;

        i. defendant's request for an evidentiary hearing on the amount subject to forfeiture;

        ii. defendant's forfeiture obligation should be based on evidence demonstrating funds that he received from illegal activity, rather than funds received for legitimate legal fees such as maintaining the estate, trust properties and other legal matters or funds received by co-defendants and co-conspirators;

        iii. defendant's request for an evidentiary hearing on the estate tax issues and fees that were previously briefed to the court;

        iv. defendant objects to the lack of any finding by the trier of fact as to when he joined the conspiracy thereby triggering the forfeiture obligation.

(Def.'s Obj. Prelim Order Forfeiture at 1-2, Crim. No. 04-127-P-H, Doc. No. 170.)

The Court responded in turn:

    I am perplexed to discover in the recently filed "Defendant's Objections to Preliminary Order of Forfeiture" (Docket Item 170) two objections referring to a request for an evidentiary hearing (¶ 4(c)(i), (iii)). I conducted an evidentiary hearing on September 30, 2005, recessed the hearing to give the defendant an opportunity to determine whether he wanted to put on additional evidence, heard nothing from counsel on that score and therefore convened a telephone conference of counsel held on October 14, 2005. I understood from that telephone conference that the defendant did not wish to put on any additional evidence. I therefore do not understand the two objections.

By October 26, 2005, the defendant shall either withdraw the objections or make a proffer of the testimony of specific witnesses and/or exhibits that he believes I have prevented him from presenting.

(October 24, 2005, Procedural Order at 1, Crim. No. 04-127-P-H, Doc. No. 171.)

In the memorandum responding to the Court's procedural order, defense counsel

explained, as relevant:

5.      The parties also agreed that the remaining issue that required resolution by the Court was the amount of the forfeiture on Counts 1 and 2. Based upon a commingling theory, the government contends that the amount of forfeiture should be $3,927,392.40 premised on the total amount of proceeds deposited into the Club's bank account from August 23, 2000 to June 9, 2004. The defendant objects to this theory on the grounds that the amount of forfeiture should be limited to illegal proceeds deposited into the account and cited to evidence at trial that at least 20% of proceeds was derived from legitimate services.  Counsel stated this issue had been briefed in the defendant's two memoranda filed before the hearing and stated that unless the Court required additional briefing or evidence to resolve the issue that defendant would rest on this submission.

6.      If the Court requires additional testimony or evidence to make the determination as to the amount of the forfeiture on Count 1, the defendant would present the following witnesses and areas of testimony:

Rod Giguere – number of total witnesses the government interviewed who went to the club and numbers that said they did not have sex at the club; interviews with women who worked at the club documenting percentage of customers to whom they provided sexual favors for money;

Joe LaMonica – customer interviewed by government who denied receiving sexual favors for money when visiting the club;

David Hall -- customer interviewed by government who denied receiving sexual favors for money when visiting the club;

Mark Maquire -- customer interviewed by government who denied receiving sexual favors for money when visiting the club;

Robert Gamble -- customer interviewed by government who denied receiving sexual favors for money when visiting the club; and

Josiah Wilcox -- customer interviewed by government who denied receiving sexual favors for money when visiting the club.

7.      Moreover, the defendant previously preserved the issue that he is entitled to a set off on the outstanding forfeiture obligation based upon estate taxes paid to the federal government. The defendant would present the following witnesses and areas of testimony:

Katherine Boyle – the need to have legal counsel comply with requirements of the federal estate tax and state tax issues; value of items in the Estate of Joel Lehrer; credit towards forfeiture obligation based upon legitimate

> attorneys fees and personal representative fees incurred in managing and
> maintaining the estate; credits toward forfeiture obligation based upon estate
> tax assessed by federal government; and
> Bob Bruno -- the need to have legal counsel comply with requirements of the
> federal estate tax and state tax issues; value of items in the Estate of Joel
> Lehrer; credit towards forfeiture obligation based upon legitimate attorneys
> fees and personal representative fees incurred in managing and maintaining
> the estate; credits toward forfeiture obligation based upon estate tax assessed
> by federal government.

(Def.'s Resp. Procedural Order at 2-4 , Crim. No. 04-127-P-H, Doc. No. 173.)  In a footnote, this

memorandum suggested:  "As stated in the two memoranda submitted before the telephonic

conferences, other evidence suggests that as much as 50% of proceeds were derived from

legitimate services."  (Id. at  2 n.1.)  On November 7, 2005, the Court entered its preliminary

order of forfeiture. (Preliminary Order Forfeiture, Crim. No. 04-127-P-H, Doc. No. 180.)   In the

sentencing memorandum to the court, counsel did not contest the forfeiture issues.  (See Feb, 24,

2006, Def's Sentencing Mem., Crim. No. 04-127-P-H, Doc. No. 238.)

> In their objection to the Court's final forfeiture order, counsel summarized:
>
> 1. The defendant objects to the extent that the Order infers that Mr. Reiner has an
> interest in $3.9 plus million dollars, or that he has that money to forfeit.
> 2. The defendant objects that the Order does not state that the amount of the judgment
> is to be credited by the money that has been forfeited or agreed to be forfeited by
> Mrs. Manzoli.
> 3.The defendant objects to the Order to the extent that the amount of forfeiture does
> not take into account the federal taxes paid by the corporate entities, Mrs. Manzoli
> and the Estate of Joel Lehrer.

(Def's Obj. Forfeiture Order at 1, Crim. No. 04127-P-H, Doc. No. 244.)   The Court entered its

final order on forfeiture on March 2, 2006.  (Final Forfeiture Order, Crim. No. 04127-P-H, Doc.

No. 258.)

From my third-party review of this record it seems that Reiner's attorneys' pursuit of the

issues raised by his forfeiture exposure was less than perfect.  That said, I am skeptical that

Reiner can meet his burden of demonstrating Strickland prejudice.  See Peralta v. United States,

29

597 F.3d 74, 79 -80 (1ˢᵗ Cir. 2010) ("In order to satisfy the "prejudice" prong, Peralta must establish that 'but for his counsel's deficiency, there is a reasonable probability that he would have received a different sentence.' Porter v. McCollum, ---U.S. ----, ---- (2009) (per curiam); see Strickland, 466 U.S. at 694; Hill v. Lockhart, 474 U.S. 52, 59 (1985). Although he need not show 'that counsel's deficient conduct more likely than not altered the outcome' of his sentencing proceeding, he must establish 'a probability sufficient to undermine confidence in [that] outcome.' Porter, 130 S.Ct. at 455-56, quoting Strickland, 466 U.S. at 693-94.").

What is more salient to the resolution of this claim is the Strickland prejudice analysis and the lack of legs to Reiner's straight-up challenge to his forfeiture judgment.   Reiner views his conviction and the forfeiture order as violative of the United States Supreme Court's United States v. Santos, 553 U.S. 507  (2008).

Santos was decided on June 2, 2008.  Accordingly, in its October 31, 2005, order this Court analyzed the challenge through the lens of the First Circuit's pre-Santos United States v. Hurley, 63 F.3d 1 (1ˢᵗ Cir. 1995). The Court explained:

> I conclude that the forfeiture the government seeks is not "grossly disproportional to the gravity of [Reiner's] offense[s]." Bajakajian, 524 U.S. at 337. The government seeks a single money judgment against Reiner in the amount of $3,927,392.40-the greatest amount sought for all four Counts-to avoid any double counting. "[H]olding a defendant liable for an amount of money foreseeably laundered by himself and his own co-conspirators is quite rational based on a proportionality analysis." Hurley, 63 F.3d at 23 (rejecting an Eighth Amendment challenge to a forfeiture judgment). "The government can collect its" $3,927,392.40 "only once, but subject to that cap, it can collect from any [co-conspirator] so much of that amount as was foreseeable to that [co-conspirator]." Id. The amounts here were not only reasonably foreseeable to Reiner but largely known to him.

United States v. Reiner, 397 F.Supp.2d 101, 114 -15 (D.Me. 2005).  The First Circuit reviewed this decision on direct appeal:

30

Our analysis of Reiner's claim need not detain us long. First, Reiner urges us to reconsider our holding in United States v. Hurley, 63 F.3d 1 (1st Cir.1995). In that case, we held that the principle of finding members of a conspiracy substantively liable for the foreseeable conduct of other members of the conspiracy extended to forfeiture rules. Id. at 22. Reiner argues that the district court erred by ordering him to pay the full value of the DHC's proceeds when he never used or personally possessed the money. However, regardless of the merits of Reiner's argument that holding him vicariously liable for the total amount of the conspiracy's windfall is unfair, we are bound by our decision in Hurley. See United States v. Malouf, 466 F.3d 21, 26 (1st Cir.2006) (noting that, except for circumstances not present here, "newly constituted panels are bound by decisions of prior panels in the same circuit"), cert. denied, 549 U.S. 1305 (2007).

United States v. Reiner, 500 F.3d 10, 18 -19 (1ˢᵗ Cir. 2007).

In his petition for a writ of certiorari Reiner argued:

This Court should exercise its supervisory powers to examine the application of 18 U.S.C. § 1982(a)(1) across the Circuits.  The First Circuit applies a definition of the words "obtained" and "proceeds" that differs from that used in the Seventh Circuit.  Because the First Circuit defines "obtained" to include temporary custody, and "proceeds" to mean gross, not net, Reiner was ordered to forfeit all of the money that came into the Club during the time of his involvement, although under the definitions applied by the Seventh Circuit – and pursuant to the dictates of reason – Reiner never actually possessed or gained that money.

(Doc. No. 18-14 at 6.) The Seventh Circuit opinion relied on by Reiner in attempting to have the

Supreme Court resolve the split with the First Circuit was United States v. Masters, 924 F.2d

1362 (7ᵗʰ Cir. 1991).

The most convincing cases Reiner relies on in his 28 U.S.C. § 2255 motion in support of

this claim for relief are the post-Santos Seventh Circuit decisions United States v. Hodge, 558

F.3d 630 (7ᵗʰ Cir. 2009) penned by Judge Easterbrook, sitting on a panel with Judges Posner and

Ripple and United States v. Lee, 558 F.3d 638 (7ᵗʰ Circuit 2009), issued the same day by a

different Seventh Circuit Panel.  Hodge  and Lee are almost directly on point in that the cases

involved similar massage parlor fronts for prostitution rings and a forfeiture ruling pursuant to 18 U.S.C. § 1956.

Many courts have addressed the 'legal process' implication of the 4-1-4 split in Santos, see, e.g., United States v. Kratt, 579 F.3d 558, 560 -565 (6th Cir. 2009) ; Davis v. Grondolsky, Civil No. 09-2882 (RMB), 2010 WL 503026, 3 -4 (D.N.J. Feb. 8, 2010), many with a view to Marks v. United States and its directive that in such situations the court culls the holding as the "position taken by those [Justices] who concurred in the judgment[] on the narrowest grounds," 430 U.S. 188, 193 (1977). See, e.g., Kratt, 579 F.3d at 560 -65; United States v. Drayer, Nos. 07-1521-cr, 08-2779-cr, 2010 WL 445653, 2 -3 (2nd Cir. Feb. 2, 2010) (unpublished); United States v. Smith, 623 F.Supp.2d 693, 698 -705 (W.D. Va. 2009); United States v. Morris, Crim. No. 6:09-16-S-DCR, 2010 WL 1049936, 2 -3 (E.D.Ky 2010).

However, this court must follow the First Circuit in analyzing the implications of Santos for Reiner's forfeiture judgment. The First Circuit has not applied Santos to 18 U.S.C. § 1956(h) and § 1957 in the context of a conviction for federal prostitution statutes. The First Circuit's United States v. Garcia-Pastrana does address the schism of the Santos 4-1-4 split:

> There is some question whether Santos applies to this case. Santos concerned money laundering convictions based on payments to winners and employees of an illegal gambling operation, and applying the money laundering statute to such essential steps of the gambling operation raised a significant merger problem. Id. 2026. Such a merger problem is not present here, where the "fake loan" scheme was in addition to the Defendants' embezzlement scheme, was not essential to it, and was concocted after the embezzlement scheme was in effect. Moreover, there is some question as to the holding of Santos, since Justice Stevens, the fifth and deciding vote, suggested in concurrence that the holding may vary by offense and the legislative history. See id. at 2032- 33; see also United States v. Kratt, 579 F.3d 558, 562 (6th Cir.2009) (interpreting Santos to apply when application of § 1956 "creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase").

32

584 F.3d 351, 380 (1st Cir. 2009).  In other words, the First Circuit has not answered how it views the holding of Santos and whether it applies at all to any forfeiture challenges other than those on all fours with the one before the Court in Santos.[43]

I find the Eleventh Circuit's March 16, 2010, United States v. Jennings to be the most straight forward resolution of the Santos conundrum.  In that opinion the Panel explained:

> Santos has limited precedential value. Three parts of Justice Scalia's four-part opinion are for a plurality of justices, and those parts do not state a rule for this case. When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. The narrow holding in Santos, at most, was that the gross receipts of an unlicensed gambling operation were not 'proceeds' under section 1956.
>        This court therefore treats Justice Stevens's opinion as controlling in its narrowest form.  … [H]ere the money laundering charges did not involve receipts from an unlicensed gambling operation. This court has previously defined proceeds as "what is produced by or derived from something ... by way of total revenue; the total amount brought in. This definition includes receipts as well as profits. This definition binds the court, and therefore there was no error--certainly no plain error--in the refusal to grant a judgment of acquittal on this point.

__ F.3d __, __, 2010 WL 916662, *7 (11th Cir. Mar. 16, 2010) (footnote omitted); accord King v. Keller, No. 09-15357, 2010 WL 1337701 (11th Cir. Apr. 7, 2010) (unpublished); see also United States v. Smith, __ F.3d __, __, 2010 WL 1330142, 11 -12 (6th Cir. Apr. 7, 2010).[44]

---

[43]        The Panel in United States v. Bucci, 582 F.3d 108, 123 -124 (1st Cir. 2009) did emphasize the lack of a 'merger' problem apropos 21 U.S.C. § 853, as opposed to the gambling activity in Santos.  See also United States v. Two Hundred Fifty-Six Thousand Two Hundred Thirty-Five Dollars and Ninety-Seven Cents, __ F. Supp. 2d __, __, 2010 WL 768717, 11 (N.D. Iowa Mar. 8, 2010);  United States v. Rubashkin, No. 08-CR-1324-LRR, 2010 WL 746879, 21 -22 (N.D. Iowa Mar. 1, 2010). However, it is obvious that the four in the Santos plurality were not willing to sign-off on this as the key criterion.

[44]        The United States Congress has certainly made its intention clear in subsequent amendments to 18 U.S.C. § 1956 and §1957.  See 18 U.S.C. § 1956 (a)(9) ("[T]he term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."); id. § 1957 (f)(3) ("[T]he term [] …'proceeds' shall have the meaning given those terms in section 1956 of this title.").  The March 23, 2009,  Senate Report indicated as to these amendments:
> This bill would amend the Federal money laundering statutes (18 U.S.C. §§ 1956, 1957) to correct an erroneous Supreme Court decision in 2008 that significantly weakened these statutes. In United States v. Santos, the Supreme Court misinterpreted the money laundering statutes, limiting their scope to only the "profits" of crimes, rather than the "proceeds" of the offenses. 128 S. Ct.

Based on the fact that the most recent decision from the First Circuit has declined to interpret the Santos holding apropos cases that do not involve gambling, I conclude that there is no basis to revisit the determination made by this court premised on Hurley, affirmed by the First Circuit on Reiner's direct appeal, and per which the United States Supreme Court denied a writ of certiorari.[45]

## B. REINER'S REQUEST FOR 28 U.S.C. § 2255 DISCOVERY

To be entitled to discovery in this habeas proceeding, Reiner must demonstrate "good cause."  Bracy v. Gramley, 520 U.S. 899, 908-909 (1997); see also Rule Governing Section 2255 Proceedings 6(a).  "'[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'"  Bracy, 520 U.S. at 908-09 (quoting Harris v. Nelson, 394 U.S. 186, 300 (1969)); accord Bader v. Warden, New Hampshire State Prison, 488 F.3d 483, 488-89 (1st Cir.2007); see also United States v. Roane, 378 F.3d 382, 402 -403 (4th Cir. 2004).  "A party requesting discovery must provide reasons for the request.  The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents."  Rule Governing Sec. 2255 Proceedings 6(b).

---

2020 (2008). The Court's decision was contrary to Congressional intent and will lead to criminals escaping culpability simply by claiming their illegal scams did not make any profit. Indeed, proceeds of " Ponzi schemes" like the Bernard Madoff case, which by their very nature do not include any profit, would be out of the reach of the money laundering statutes under this decision. This flawed decision needs to be corrected immediately, as dozens of significant money laundering cases have already been dismissed.
 S. Rep. No. 111-10, at 4 (2009).  See  United States  v. Morris, Crim. No. 6:09-16-S-DCR, 2010 WL 1049936, 2 -3 (E.D.Ky Mar. 19, 2010).

[45]    This also disposes of any claim that Reiner has vis-à-vis his attorneys' failures to have this court presciently embrace the Santos plurality definition of proceeds. (See Sec. 2255 Mot. at 6d ¶ r, Doc. No. 1 at 12.)  Reiner also speculates that Mrs. Manzoli has already forfeited all DHC profits and the Government has thereby collected the full amount to which it is entitled.  (Id.) The resolution of this joint liability is not before the court at this juncture.

In his declaration Reiner insists that he needs substantial discovery to rebut the government's argument for summary dismissal. (Id. ¶ 158.)  Noting that the FBI had the club under periodic surveillance since 1998, Reiner argues that this protracted investigation supports his defense that he did not have a "sufficient basis to conclude that the club was a front for prostitution."  (Id. ¶ 162.)  In Reiner's view this also supports his entitlement to comprehensive 28 U.S.C. § 2255 discovery "of all federal investigative and/or prosecutorial files (and electronic communications such as e-mail) referring or relating to alleged prostitution occurring at the DHC."  (Id.)  He faults his attorneys for not aggressively pursuing this "exculpatory" information and believes that the defense was not given complete and adequate discovery from the prosecution. (Id.)

Reiner also sets forth a long narrative about Mary Ann Manzoli and her claim that she did not have reason to believe that prostitution was occurring at the DHC until late 2003 or 2004. (Id. ¶ 166.)  He points out the Manzolis previously owned the Club Parisanne and the same rumors circulated about that undertaking as they did with DHC.  (Id.)   Reiner believes that the federal and Massachusetts authorities must have conducted an investigation involving the Club Parisanne but never prosecuted the matter. (Id.)   He describes this information as critical to his defense because of this Court's sentencing reliance on Mrs. Manzoli's awareness of prostitution at the DHC as evidence of Reiner's willful blindness.  (Id.)   He also connects this discovery request to a request for information pertaining to the federal and Maine authorities' investigation into the Kittery Police Department's relationship with the DHC.  (Id.) He describes information apropos both investigations as improperly withheld.  (Id.)

In his memorandum in opposition to the United States' motion for summary dismissal, Reiner relays that he thinks that through discovery he could challenge the forfeiture order  on the

grounds that only a portion of the revenues he handled were attributable to prostitution.  (Pet'r

Opp'n Gov't Mot. Summ. Dismissal at 11.)  He also insists that he should be able to depose the

men that told the investigators that they did not have sex at the DHC, and other customers, "to

bolster his defense that he had no reason to know that prostitution was wide spread at the DHC."

(Pet'r Opp'n Gov't Mot. Summ. Dismissal at 56-67.) Through his memorandum in support of his

motion for discovery, Reiner sets out that he only billed two hours a week for his representation

of the DCH.  (Mem. Mot. Discovery at 2.)

>       With respect to the specifics of his discovery request, Reiner seeks:

- Employment records disclosing the identities of the attendants during the period from
  2000 to 2004 and depositions of these individuals. (Id. at 3.)
- Depositions of certain customers of the DHC interviewed by investigators who were not
  called to testify at trial and who had indicated that they were not offered sexual services
  at the DHC.  (Id.)
- Documents revealing the names and contact information of the customers of the DHC
  from the period of 2000 to 2004.  (Id.)
- Deposition of the club's cleaner, Rosa Schlieman.  (Id.)
- Documents from the York County District Attorney's Office pertaining to its
  investigation of the club.  (Id. at 3-4.)
- Deposition of Michael Canterra who was in charge of the investigation. (Id. at 4.)
- Maine Attorney General Office documents pertaining to the DHC investigation by the
  Kittery Police Department and the deposition of a designated person responsible for that
  investigation. (Id.)
- Documents from the Northeast Institute of Whole Health with respect to its training
  program, investigative reports on the institution, and the depositions of two of its
  principals. (Id.)
- Kittery Police Department documentation of its various investigations into the DHC from
  1990 to 2004 and deposition of Chief Strong and Detectives Hackett and Avery.  (Id. at
  5.)
- Documents from the IRS investigation and the deposition of IRS special agent Gigerre
  with respect to the IRS investigation of the DHC between 1990 and 2004.  (Id.)
- Documents pertaining to the investigation of the so-called pimps and decision regarding
  whether or not to prosecute them.  (Id.)
- Documents  in the control of Robert Bruno stemming from his accounting for DHC and a
  deposition of Bruno. (Id.)
- Documents in the control of Attorney Ainsworth concerning his representation of DHC
  and a deposition of Ainsworth. (Id. at 6.)

- Documents regarding the investigation as it concerned Russell Aharonian and a deposition of someone knowledgeable about the interview of and communications with Aharonian. (Id.)

The focus of these discovery requests seems to be as follows:

> Reiner seeks to establish that not all attendants engaged in prostitution at the DHC, but more importantly seeks to obtain corroboration from the Club's attendants that he took the time to speak to them as a group and individually to ensure that they understood that the business of the DHC was not to provide any service to customers beyond a relaxation rub, and that he specifically advised and counseled them against providing any sexual services for money. This is relevant to his trial counsels' complete failure to challenge the government's theory that the amount that [R]einer should be required to forfeit was the total amount of the DHC's revenues earned during the relevant time period. Reiner should be allowed to now prove that any forfeiture should be based on the profits derived by the DHC from the club's revenues that are reasonably attributable to acts of prostitution committed by the attendants.

(Id. at 9.)  He also stresses that the evidence he seeks would be relevant to the jury determination of guilt in view of the Court's instruction that the jury could find Reiner not guilty if they found that he acted in good faith as the club's attorney.  (Id. at 12.)[46] With respect to the post-trial report into the investigation of wrongdoing on the part of the Kittery Police Department, Reiner points out that it was based in part on what came out during trial, was not available until after trial, supports his good faith defense, and could support an acquittal. (Id. at 13.)

Recognizing that the trial judge could have a different perspective on these requests and what the impact might have been on Reiner's conviction and sentence, Puglisi v. United States, 586 F.3d 209, 214 (2d Cir. 2009) ("[W]hen the judge that tried the underlying proceedings also presides over the Section 2255 motion, a less-than full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner."), I view Reiner's § 2255 discovery request as a fishing expedition that does not

---

[46]      I am a bit skeptical of Reiner's need to undergo discovery at this late date to identify attendants that he professed to have one-on-one conferences with.

meet the Rule 6 good cause standard.  See DeVincent v. United States, 632 F.2d 145, 146 (1ST Cir 1980); see also Smith v. United States, 618 F.2d 507, 509 (8TH Cir. 1980);  Dziurgot v. United States, No. 90-1347, 1990 WL 254082, 5 (Nov. 16, 1990) (unpublished)

### *Conclusion*

I have been thoroughgoing in my review of this record.  The fact that Reiner was convicted on these counts and was subjected to this forfeiture judgment reflects a contested but constitutionally firm adversarial process.  Reiner has set forth extensive arguments to try to refute his conviction and the propriety of his forfeiture burden. I do not perceive in his pleadings a basis for further discovery or 28 U.S.C. § 2255 relief.

For the reasons stated above, I recommend that the Court deny Reiner 28 U.S.C. § 2255 relief.  I further recommend that a certificate of appealability should not issue in the event Reiner files a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 13, 2010.

38